FILED
COURT OF APPEALS
DIVISION II

2013 JUN 27 AM 9: 31

STATE OF WASHINGTON

BY_____
          DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　　Respondent,<br><br>v.<br><br>EDWARD MARK OLSEN,<br><br>　　　　　　　Appellant. | No. 42135-6-II<br><br><br><br>PUBLISHED OPINION |

QUINN-BRINTNALL, J. — On December 21, 2010, a jury found Edward Olsen not guilty of attempted first degree murder but guilty of attempted second degree murder, first degree burglary, and felony harassment, all with domestic violence aggravators, for pouring gasoline on and threatening to kill Bonnie Devenny while she was in bed.[1] The trial court sentenced Olsen to an exceptional sentence of 360 months in light of the crimes having occurred in the presence of Devenny and Olsen's 12-year-old son, J.E.O. Olsen appeals his conviction and sentence, arguing that (1) the trial court improperly admitted evidence of incidents of past domestic violence in Olsen and Devenny's relationship; (2) the trial court's "to convict" instruction for felony harassment omitted an essential element of the crime; and (3) the trial court erred in

---

[1] The jury also found Olsen guilty of third degree malicious mischief, a misdemeanor, for breaking the passenger window of Devenny's car.

concluding that for calculating Olsen's offender score, a California conviction for "terrorist threats" was comparable to felony harassment in Washington.

Because the trial court properly admitted evidence of Olsen and Devenny's relationship and in *State v. Allen*, 176 Wn.2d 611, 627-28, 294 P.3d 679 (2013), our Supreme Court held that the definition of "true threat" need not be provided in a trial court's "to convict" instructions, we affirm Olsen's convictions. And finding no error in the trial court's calculation of Olsen's offender score, we affirm his sentence.

## FACTS

BACKGROUND

Around 4:00 AM on November 29, 2009, Devenny was awakened by Olsen, the estranged father of her three children, dousing her bed in gasoline while threatening that she was going to die. Devenny "struggled and jumped up out of bed screaming." 5 Report of Proceedings (RP) at 626. J.E.O., Devenny and Olsen's 12-year-old son who had fallen asleep in Devenny's room while watching television earlier in the evening, awoke to his mother's screaming. J.E.O. grabbed Olsen and "tried to get him as far away as possible from [Devenny]." 5 RP at 586. J.E.O. forced Olsen into the hallway, while Devenny made it into the bathroom across the hall and escaped through the bathroom window. Devenny ran across the street to the Wyatt House Retirement Center where J.E.O. later ran to meet her.

Wyatt House caretaker Terrance Black let Devenny and J.E.O. inside the secured facility and because Devenny "was just screaming that the gasoline was burning her," called 911. 3 RP at 231. During the call, Devenny relayed that Olsen had broken into her home and thrown gasoline on her and that she was worried that "he's coming after me." Clerk's Papers (CP) at 176. Bainbridge Island Police Officer Michael Tovar responded quickly to the scene where he

2

observed that Devenny was "hyperventilating," "looked scared," and had "obvious redness to her legs." 3 RP at 242-44. Devenny told Tovar that "she was lying in bed when she was awoken by a male pouring gas on top of her . . . who she identified as Mr. Olsen." 3 RP at 246. Devenny also told Tovar that while pouring the gasoline, Olsen "was saying something to the effect of: 'Die, bitch. Die.'" 3 RP at 246. Bainbridge Island Police Officer Lloyd Berg arrived in time to hear Devenny tell Tovar about the altercation. Berg could smell the gasoline on Devenny.

Officers Berg and Tovar then left the Wyatt House to see if Olsen was still at Devenny's home. Berg and Tovar entered through the open front door and performed a sweep of the residence. Tovar immediately smelled gasoline once inside. Both Tovar and Berg noticed that the gasoline smell was strongest in the master bedroom and both noticed a red gasoline can near the foot of the bed. Completing the sweep, Berg and Tovar checked the perimeter of the house but did not find Olsen. They noted that the front passenger window of Devenny's car was broken.

Bainbridge Island Police Detective Trevor Ziemba responded to a call about the incident at approximately 5:00 AM. Even though Devenny had changed her clothes, Ziemba could still smell gasoline. After interviewing Devenny and J.E.O., Ziemba went to Devenny's home. Upon entering, he immediately smelled gasoline and the odor "was just unbelievable." 4 RP at 330. The gasoline smell in the master bedroom was "so strong" that it made Ziemba "nauseous" and he "could only spend a limited amount of time in the room." 4 RP at 331. Ziemba noticed a lighter on the night stand near the bed which he collected as evidence. Police were unable to locate Olsen at the time, but were able to corral the family dog which had run off during the incident. They did not notice any gasoline smell on the dog.

Toward the end of January, Olsen turned himself in to law enforcement in Arizona. Detectives Ziemba and Christian Hemion flew to Arizona to bring Olsen back to Washington. After transporting Olsen to Washington, Hemion advised Olsen of his *Miranda*[2] rights. Olsen waived those rights and spoke with the detectives about the incident. Olsen told the detectives that on the night of the incident, he broke out the window of Devenny's car with a large rock so that he could open the home's garage door with the opener in the car. Olsen then said that he "drank some alcohol," "had a casserole and . . . watched some TV." 4 RP at 352. Sometime later, Olsen needed to use the bathroom, but "there was a dog in there" that was denying him access to the bathroom. 4 RP at 352. Then,

> because he had to use the bathroom so bad . . . he tried to use the casserole to coax the dog out of the bathroom, and when that didn't work he then went into the garage and took a can of gasoline, went into the bathroom and poured gasoline -- or started pouring gasoline on the dog as the dog ran into the bedroom and then jumped on the bed, which was occupied by [Devenny] and [J.E.O.].

4 RP at 353. Olsen told the detectives that he did not believe Devenny was in the house as these events transpired and that the dog jumping on the bed was "why there [was] gasoline in the bedroom." 4 RP at 425.

The State initially charged Olsen with attempted first degree murder and first degree burglary, both with domestic violence aggravators. RCW 9A.32.030(1)(a), .020(1); RCW 9A.52.020; RCW 10.99.020. The State later amended the charges to add attempted second degree murder, felony harassment, and third degree malicious mischief, all with domestic violence aggravators. RCW 9A.32.050(1)(a); RCW 9A.28.020(1); RCW 9A.46.020(1); RCW 9A.48.090(1)(a); RCW 10.99.020.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

No. 42135-6-II

PROCEDURE

Pretrial proceedings began on June 15, 2010. The trial court heard the State's offer of proof and argument from both parties concerning admitting evidence under ER 404(b) of two previous incidents of domestic violence involving Devenny and Olsen. The court found by a preponderance of the evidence that

> [o]n April 22, 1998 Ms. Devenny allowed [Olsen], her ex-boyfriend, to stay at her house. While she was on the phone [Olsen] became angry and started yelling at her. [Olsen] threw Ms. Devenny on the bed so she landed on her stomach and wrapped a cord around her neck. He began to choke Ms. Devenny so hard that she vomited. . . .
> [Olsen] grabbed a couple of pillows and covered her face so she couldn't breathe and became light-headed. She continued to fight him.
> [Olsen] started tying Devenny up with an extension cord telling her that he was going to rape and kill her and [bury] her that night. She was able to escape when [Olsen] thought that someone else was in the house.
> The second episode . . . involve[s] a California incident occurring on May 23, 2000. . . .
> . . . Ms. Devenny contacted law enforcement and reported that for the past several days she and [Olsen] had been arguing back and forth about their relationship. That evening [Olsen] told her that he was tired of their arguments and began pushing her around and hitting her in the head. Ms. Devenny fell down, and [Olsen] sat on top of her and held her down.
> He then wrapped duct tape around her lower legs. As [Olsen] was doing this, he told her to say good-bye to her children because this would be the last time they would see their mom.
> [Olsen told Devenny] that he was, quote, going to kill her and cut her up into little pieces. [Olsen] told Ms. Devenny that he was going to put her pieces in a plastic storage container that was on the floor next to her.[3]

RP (June 18, 2010) at 2-4.

Trial began on December 13. In addition to eliciting testimony concerning the November 29 events, the State called Devenny to testify—after the trial court gave a limiting instruction—

---

[3] The transcripts mention written ER 404(b) findings on multiple occasions. Written ER 404(b) findings were not designated for our review.

5

about three previous incidents of domestic violence involving her and Olsen.[4] Devenny testified that about a week before the gasoline incident, she and Olsen got into "a verbal altercation that turned physical" and Olsen struck her six times in the face in front of their three children. 5 RP at 619. She also testified that in 1998, Olsen tied her up with an electrical cord and choked her. She said that at the time Olsen told her, "You better say 'good-bye' to your children." 5 RP at 622. Last, Devenny testified concerning the 2000 incident from California where Olsen began duct taping her and told her "he was going to cut [her] in pieces and put [her] in a blue bin." 5 RP at 623.

Two of Devenny's three children testified about the fight that occurred shortly before the gasoline event. J.E.O. testified that "[t]here was a lot of fist throwing" from both Devenny and Olsen and that Devenny received a "bloody eyebrow, and that is about it." 5 RP at 581-82. J.E.O.'s older brother, J.M.O., testified that he heard an argument but did not see the actual fight or that Devenny suffered any injuries as a result. J.M.O. also testified that the incident from 2000 began as a result of Devenny punching their five year-old brother, E.J.O., in the face. E.J.O. fell down the stairs on account of the blow and, in the process, knocked over J.M.O. Devenny then hit J.M.O. for crying. According to J.M.O., Olsen came in the door shortly

---

[4] As previously discussed, the trial court ruled at a pretrial ER 404(b) hearing that evidence of the 1998 and 2000 incidents would be admissible. Prior to Devenny's testimony, the trial court heard an offer of proof outside the jury's presence concerning a fight that occurred approximately one week before the gasoline incident. The trial court ruled that the State had proven by a preponderance of the evidence (based on what appeared "to be a healing wound above [Devenny's] left eyebrow" in pictures taken on the night of the gasoline incident) that the fight from the week before the gasoline incident occurred. 5 RP at 567. The trial court also ruled that "evidence of an assault so close in time to the charged event is relevant to the issue of motive and intent." 5 RP at 568.

thereafter and began tying Devenny up to stop her from hitting the children. Olsen did not testify.

On December 21, the jury returned its verdict finding Olsen not guilty of attempted first degree murder but guilty of attempted second degree murder, first degree burglary, felony harassment, and third degree malicious mischief. The jury also found that all of the crimes were aggravated domestic violence offenses. On April 11, 2011, the trial court sentenced Olsen to an exceptional sentence of 360 months. Olsen appeals his sentence and convictions.

DISCUSSION

PRIOR BAD ACTS

Olsen argues that the trial court abused its discretion in allowing the State to present evidence under ER 404(b) of prior acts of violence that Olsen committed against Devenny to show intent, motive, and absence of mistake or accident related to the attempted murder charges. Specifically, Olsen contends that these acts were irrelevant and that the potential prejudicial effect of the evidence outweighed any probative value such evidence might hold. Because the trial court properly interpreted ER 404(b) and did not abuse its discretion in admitting evidence of the incidents for the limited purposes of establishing motive, intent, or lack of mistake, we disagree.

We review a trial court's interpretation of ER 404(b) de novo. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). If the trial court has correctly interpreted ER 404(b), we review the trial court's ruling to admit or exclude evidence of misconduct for an abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 744-45, 202 P.3d 937 (2009). A trial court abuses its discretion by not following the requirements of ER 404(b) in admitting evidence of a defendant's prior acts of misconduct. *Fisher*, 165 Wn.2d at 744-45.

Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." *Foxhoven*, 161 Wn.2d at 175 (quoting *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)). Thus, evidence of prior bad acts must be relevant to a material issue before the jury, *State v. Gogolin*, 45 Wn. App. 640, 644, 727 P.2d 683 (1986), and ER 404(b) must be read in conjunction with ER 403, which "requires exclusion of evidence, *even if relevant*, if its probative value is substantially outweighed by the danger of unfair prejudice." *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986).

With these considerations in mind, Washington courts have developed a four-part test for ruling on the admissibility of prior acts evidence: before admitting ER 404(b) evidence, a trial court "must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). "This analysis must be conducted on the record." *Foxhoven*, 161 Wn.2d at 175.

Here, Olsen does not challenge the trial court's oral ruling that the State proved the three previous instances of misconduct by a preponderance of the evidence. Accordingly, these unchallenged findings are treated as verities on appeal. *State v. Chanthabouly*, 164 Wn. App. 104, 129, 262 P.3d 144 (2011) (unchallenged oral rulings are verities on appeal), *review denied*,

173 Wn.2d 1018 (2012). Thus, we must solely determine whether the trial court admitted the evidence on appropriate legal grounds (steps 2 and 3 of the test described above) and, if so, whether the trial court abused its discretion in concluding that the probative value of the evidence outweighed its potential for prejudice (step 4).

Contrary to Olsen's characterization of the trial court's ER 404(b) analysis, the court performed extensive, on-the-record analysis of why the State should be allowed to submit evidence of Olsen's prior violence toward Devenny. As to the incidents from 1998 and 2000, the trial court ruled that evidence of these prior acts "is relevant in the Attempted Murder in the First Degree charge on the issue of intent" and also to rebut Olsen's "statements to the police that the splashing of gasoline upon Devenny and her son was accidental or incident[al] to trying to use the gas to move the dog." RP (June 18, 2010) at 13. The trial court also ruled that "the evidence is also relevant . . . to the issue of motive, which goes towards premeditation in that it was clearly expressed in the prior incidents that the defendant's intent was to kill" Devenny. RP (June 18, 2010) at 13. As to the fight between Devenny and Olsen that occurred one week before the gasoline incident, the trial court ruled that "evidence of an assault so close in time to the charged event is relevant to the issue of motive and intent." 5 RP at 568.

Washington law clearly supports admitting evidence of prior acts in circumstances such as this. In *State v. Powell*, 126 Wn.2d 244, 261, 893 P.2d 615 (1995) (quoting *State v. Parr*, 93 Wn.2d 95, 102, 606 P.2d 263 (1980)), for instance, the Washington Supreme Court pointed out that "'[i]t is undoubtedly the rule that evidence of quarrels between the victim and the defendant preceding a crime, and evidence of threats by the defendant, are probative upon the question of the defendant's intent.'" Moreover, when a defendant asserts that certain conduct is accidental, evidence of prior misconduct is *highly* relevant as it will tend to support or rebut such a claim.

*Gogolin*, 45 Wn. App. at 646. Thus, in *Gogolin*, Division One of this court allowed evidence of a defendant's prior assaultive behavior toward his wife as "the evidence was relevant and probative since it tended to rebut [the defendant's] defense of accident by demonstrating his history of hostility and abusive conduct toward [the victim]." 45 Wn. App. at 646. The *Gogolin* court further stated that "the evidence tended to make more probable the fact that [the victim's] injuries resulted from an intentional assault rather than an accident." 45 Wn. App. at 646. Accordingly, we hold that the trial court correctly interpreted ER 404(b) when it concluded that the State could present evidence of Olsen's prior assaultive behavior toward Devenny to show intent and motive and, especially, to counter his claims of accident.

In addition to determining whether the trial court admitted the evidence on appropriate legal grounds, we must also decide whether the trial court abused its discretion in concluding that the probative value of the evidence outweighed its potential for prejudice. On the record here, the trial court carefully weighed the probative value of the offered evidence against its potentially prejudicial effects. While recognizing that "evidence of this type is prejudicial," the court concluded that the evidence "does have a high degree of value to proving the intent and motive. It also does have a high degree of value in rebutting absence of mistake." RP (June 18, 2010) at 15. Olsen utterly fails to explain how the trial court's analysis entailed an abuse of discretion. The evidence admitted clearly had a high degree of probative value—especially in light of Olsen's claim that the spilling of gasoline on Devenny and J.E.O. was an accident

incidental to his attempt to *relocate* the dog. Accordingly, we hold that the trial court did not abuse its discretion in admitting evidence of Olsen's prior bad acts.[5]

FELONY HARASSMENT INSTRUCTION

Olsen next argues that the trial court erred in giving a "to convict" instruction on the felony harassment charge that omitted the requirement that the threat be a "true threat." Because the trial court properly gave a definitional instruction limiting criminalized behavior to "true threats," and the Washington Supreme Court has recently held that when such a definitional instruction is given, "true threat" need not be defined as an element in the "to convict" instructions for felony harassment, we disagree.

We review jury instructions de novo, "within the context of the jury instructions as a whole." *State v. Jackman*, 156 Wn.2d 736, 743, 132 P.3d 136 (2006). Jury instructions, "taken in their entirety, must inform the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt." *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026 (1996).

Because threatening language *may* be protected by the First Amendment, jury instructions must carefully distinguish "true threats" (which receive no First Amendment protection) from constitutionally protected speech. *State v. Williams*, 144 Wn.2d 197, 207-08,

---

[5] Olsen makes passing reference in his brief, without explicitly raising the issue of prosecutorial misconduct, to the fact that "the prosecutor improperly made a propensity argument to the jury" based on the admitted ER 404(b) evidence. Br. of Appellant at 11. Because this court "will not review issues for which inadequate argument has been briefed or only passing treatment has been made," *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004), we do not fully address this issue. We note, however, that our review of the prosecutor's closing argument reveals that the prosecutor was not focused on proving Olsen's conformity with prior behavior but, instead, on countering Olsen's claim that pouring gasoline on Devenny occurred accidentally while he was attempting to douse the dog.

26 P.3d 890 (2001). A "true threat" is "'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life' of another person." *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004) (internal quotation marks omitted) (quoting *Williams*, 144 Wn.2d at 207-08).

Here, the trial court gave the following definitional instruction of "true threat" in instruction 23:

> Threat means to communicate, directly or indirectly, the intent—
> To cause bodily injury in the future to the person threatened or to any other person; or
> To do any other act which is intended to harm substantially the person threatened or another with respect to that person's health, safety, business, financial condition or personal relationships.
> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

CP at 240. This instruction clearly defines "true threats," including the constitutionally required mens rea element distinguishing "true threats" from idle talk or jests.[6] Accordingly, this instruction does not run afoul of the First Amendment.

Nevertheless, Olsen contends that because only "true threats" may be prosecuted, the "to convict" instruction for the felony harassment charge must include an element stating that the

---

[6] *See State v. Schaler*, 169 Wn.2d 274, 283-84, 236 P.3d 858 (2010).

defendant's threat constituted a "true threat."[7] The Washington Supreme Court has recently rejected this argument.

In *Allen*, the defendant argued that even though the trial court gave a separate definitional instruction for true threats, "because only true threats may be prosecuted, the true threat requirement is an essential element [that] must be included in the information and to-convict instruction" for felony harassment. 176 Wn.2d at 626-27. The *Allen* court[8] rejected this argument, holding that "failure to include the true threat requirement in the . . . to-convict instruction was not error." 176 Wn.2d at 630. As the *Allen* court explained, Washington appellate courts have consistently arrived at this conclusion:

> [T]he Court of Appeals has repeatedly held the true threat requirement is not an essential element of harassment statutes. In *State v. Tellez*, 141 Wn. App. 479, 170 P.3d 75 (2007), the defendant, charged with felony telephone harassment

---

[7] The trial court gave the "to convict" instruction for felony harassment as instruction 24:

To convict the defendant of the crime of Harassment as charged in Count IV, each of the following elements of the crime must be proved beyond a reasonable doubt—

(1) That on or about November 28, 2009 through November 29, 2009, the defendant knowingly threatened to kill Bonnie Devenny immediately or in the future;

(2) That the words or conduct of the defendant placed Bonnie Devenny in reasonable fear that the threat to kill would be carried out;

(3) That the defendant acted without lawful authority; and

(4) That the threat was made or received in the State of Washington.

CP at 241. We note that the second element of this instruction appears to state the requirement that the threat be a "true threat"—that a reasonable person in the speaker's position would foresee that his or her words or conduct would place the victim in *reasonable fear* that the *threat to kill would be carried out*. *Cf.* ¶ 3 of the trial court's instruction 23.

[8] The *Allen* decision produced four opinions by the Supreme Court (the lead opinion, cited herein, two concurrences, and a dissent). Thus, the lead opinion in *Allen* is a plurality decision only signed by four justices. However, the other three opinions in *Allen* do not address this issue—whether the "to convict" instructions for felony harassment must explicitly limit threats to "true threats"—at all and, accordingly, common sense dictates that the whole of the court agreed with the lead opinion's assessment of this particular issue.

based on a threat to kill, claimed the information and to-convict instruction were deficient because they lacked the requirement of a true threat, an essential element of the crime. The Court of Appeals agreed with the State that "the constitutional concept of 'true threat' merely defines and limits the scope of the essential threat element in the felony telephone harassment statute and is not itself an essential element of the crime." *Tellez*, 141 Wn. App. at 484. In so holding, the court in *Tellez* construed our holding in [*State v. Johnston*, 156 Wn.2d 355, 127 P.3d 707 (2006)]—that it is error not to give a limiting instruction defining threat to include only true threats—as characterizing the true threat concept as definitional, and not as an essential element of any threatening-language crime. *Tellez*, 141 Wn. App. at 484. In *State v. Atkins*, 156 Wn. App. 799, 236 P.3d 897 (2010), the defendant, charged with felony harassment, likewise contended the information and to-convict instruction were deficient for failing to contain the essential element of a true threat. The Court of Appeals found *Tellez* dispositive, holding that so long as the jury was instructed as to the true threat requirement, the defendant's First Amendment rights were protected.

176 Wn.2d at 629-30.

This case is on all fours with the *Allen* case—the jury instructions in both cases are nearly identical. Here, the trial court properly provided a definitional instruction limiting threats to "true threats" (instruction 23 discussed above) in conjunction with the "to convict" instruction for felony harassment (instruction 24). Nothing more is required. Accordingly, we reject Olsen's contention that the trial court's jury instructions were erroneous.

COMPARABILITY OF "TERRORISTIC THREATS" CONVICTION

Last, Olsen contends that the State failed to prove that his 2000 California conviction for "terrorist threats" was comparable to the Washington crime of felony harassment and, in result, the trial court miscalculated his offender score. Because Olsen specifically pleaded no contest in 2000 to threatening to kill Devenny, we hold that Olsen's prior offense for terroristic threats is factually comparable to felony harassment in Washington and, accordingly, the trial court did not err when it included Olsen's 2000 California conviction in calculating his offender score.

We review the trial court's classification of out-of-state crimes and the trial court's calculation of a defendant's offender score de novo. *State v. Labarbera*, 128 Wn. App. 343, 348, 115 P.3d 1038 (2005); *State v. Bergstrom*, 162 Wn.2d 87, 92, 169 P.3d 816 (2007). "When prior out-of-state convictions are used to increase an offender score, the State must prove the conviction would be a [comparable] felony under Washington law." *Labarbera*, 128 Wn. App. at 348; RCW 9.94A.525(3).

We employ a two-part test to determine the comparability of a foreign offense. *State v. Thiefault*, 160 Wn.2d 409, 415, 158 P.3d 580 (2007). First, we determine whether the foreign offense is legally comparable—"that is, whether the elements of the foreign offense are substantially similar to the elements of the Washington offense." *Thiefault*, 160 Wn.2d at 415. Second, if the foreign offense elements are broader than Washington's elements, precluding legal comparability, we determine "whether the offense is factually comparable—that is, whether the conduct underlying the foreign offense would have violated the comparable Washington statute." *Thiefault*, 160 Wn.2d at 415 (citing *State v. Morley*, 134 Wn.2d 588, 606, 952 P.2d 167 (1998)). "In making its factual comparison, [this court] may rely on facts in the foreign record that are admitted, stipulated to, or proved beyond a reasonable doubt." *Thiefault*, 160 Wn.2d at 415 (citing *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 258, 111 P.3d 837 (2005)).

Here, Olsen pleaded no contest in 2000 to committing the California felony crime of "terrorist threats." At the time, the former *Cal. Penal Code* § 422 (1998) defined the crime as follows:

> Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person

threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety.

Washington's harassment statute at the time[9] provided,

(1) A person is guilty of harassment if:
    (a) Without lawful authority, the person knowingly threatens:
    (i) To cause bodily injury immediately or in the future to the person threatened or to any other person. . . .

    . . . .

    (2) A person who harasses another is guilty of a gross misdemeanor . . . except that the person is guilty of a class C felony if . . . (b) the person harasses another person under subsection (1)(a)(i) of this section by threatening to kill the person threatened or any other person.

Former RCW 9A.46.020 (1999).

The elements of the California and Washington crimes are not legally comparable: under California's statute, it is possible to be convicted of a felony for threatening great bodily injury *or* death, whereas felony harassment in Washington requires a true threat involving death; a threat involving bodily injury constitutes only a misdemeanor. Thus, we must determine whether the *conduct* underlying Olsen's "terroristic threats" conviction would have been a felony violation of Washington's harassment statute. *Thiefault,* 160 Wn.2d at 415.

Unlike in Washington, California allows defendants to plead "no contest" to charged offenses. Under California law, the "'legal effect of such a plea, to a crime punishable as a felony, shall be the same as that of a plea of guilty for all purposes.'" *California v. Wallace,* 33 Cal. 4th 738, 749, 93 P.3d 1037, 16 Cal. Rptr. 3d 96 (2004) (quoting *Cal. Penal Code* § 1016(3)). And under established California law, a guilty plea "amounts to an admission of *every*

---

[9] Although Washington's current harassment statute is nearly identical to the statute in effect in 2000, "the elements of the out of state crime must be compared to the elements of a Washington criminal statute in effect when the foreign crime was committed." *In re Lavery,* 154 Wn.2d at 255.

*element* of the crime charged." *California v. Jones*, 52 Cal. 2d 636, 651, 343 P.2d 577 (1959) (emphasis added), *cert. denied*, 361 U.S. 926 (1960). Thus, when a defendant is charged under a California statute that employs the inclusive disjunctive—as is this case with "or" here—the defendant, in pleading no contest, admits guilt to all elements of the statute set forth in the charging document.[10] *California v. Tuggle*, 232 Cal. App. 3d 147, 154, 283 Cal. Rptr. 422 (1991), *overruled on other grounds by California v. Jenkins*, 10 Cal. 4th 234, 893 P.2d 1224, 40 Cal. Rptr. 2d 903 (1995).

In 2000, while Olsen and Devenny were living in California, Olsen began duct taping her and told her "he was going to cut [her] in pieces and put [her] in a blue bin." 5 RP at 623. The information charging Olsen with violating California's terrorist threats statute states that Olsen "did willfully and unlawfully threaten to commit a crime which would result in death *and* great bodily injury to [Devenny], with the specific intent that the statement be taken as a threat." Ex. 37 (emphasis added). The information also stated that

> [i]t is further alleged that the threatened crime, on its face and under the circumstances in which it was made, was so unequivocal, unconditional, immediate and specific as to convey to BONNIE MARIE DEVENNY a gravity of purpose and an immediate prospect of execution.
> It is further alleged that the said BONNIE MARIE DEVENNY was reasonably in sustained fear of his/her safety and the safety of his/her immediate family.

Ex. 37. Thus, Olsen, by pleading no contest, pleaded guilty to threatening to kill Devenny *and* threatening to gravely injure her. Because of this, the conduct that Olsen pleaded no contest to in the 2000 information involves (1) a true threat against Devenny (2) involving a threat to kill that (3) placed Devenny in fear of "an immediate prospect of execution" of the threat, namely Olsen

---

[10] In addition, during Olsen's current trial, he signed a stipulation admitting that "[i]n the year 2000 in Solano County, California the defendant Edward Mark Olsen pleaded guilty to Terrorist Threats." CP at 203.

carrying out his threat to kill. Ex. 37. Accordingly, the conduct underlying Olsen's terrorist threat conviction would have satisfied the conduct necessary to be convicted of felony harassment in Washington under RCW 9A.46.020; the crimes are factually comparable and the trial court correctly included this conviction in calculating Olsen's offender score.

Shortly before we heard oral argument in this case, Olsen submitted a statement of additional authorities pursuant to RAP 10.8, directing our attention to *State v. C.G.*, 150 Wn.2d 604, 80 P.3d 594 (2003). In *C.G.*, a juvenile case also involving a threat to kill under RCW 9A.46.020, our Supreme Court held that

> [i]n order to convict an individual of felony harassment based upon a threat to kill, RCW 9A.46.020 requires that the State prove that the person threatened was placed in reasonable fear that the threat to kill would be carried out as an element of the offense.

150 Wn.2d at 612.

As we explained previously, the 2000 information filed in California alleged that Olsen communicated the death threat to Devenny in such a manner as "to convey to [Devenny] a gravity of purpose and an immediate prospect of execution" and that the threat left Devenny "in sustained fear of [her] safety." Ex. 37. Having stipulated to both of these facts by pleading no contest, we are satisfied that Olsen stipulated to Devenny's being "placed in reasonable fear that a threat to *kill* [would] be carried out."[11] *C.G.*, 150 Wn.2d at 610.

---

[11] Olsen argues that because the 2000 information states that Devenny was "reasonably in sustained fear of his/her safety and the safety of his/her immediate family" and does not explicitly mention fear of death, the State failed to prove a degree of fear sufficient to establish felony harassment under *C.G.* Ex. 37. This reading of the information, though, divorces a single sentence from the entirety of the document. When read as a whole, the information clearly explains that the threat involved (a) a "true threat," e.g., "'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life' of another person," *Kilburn*, 151 Wn.2d at 43 (internal quotation marks omitted) (quoting

The conduct underlying Olsen's terrorist threat conviction would have satisfied the conduct necessary to be convicted of felony harassment in Washington under RCW 9A.46.020. The crimes are factually comparable and none of the cases Olsen relies on dictate a different result. Accordingly, we conclude that the trial court correctly included this conviction in calculating Olsen's offender score and, in result, the trial court's calculation of Olsen's offender score is legally correct. Finding no error, we affirm Olsen's convictions and sentence.

QUINN-BRINTNALL, J.

We concur:

JOHANSON, A.C.J.

BJORGEN, J.

---

*Williams*, 144 Wn.2d at 207-08); that (b) caused the person threatened "reasonable fear that the threat made is the one that will be carried out." *C.G.*, 150 Wn.2d at 610.