# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59287-8-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JOHN LOUIS VASSALLO, JR., | |
| Appellant. | |

PRICE, J. — Tension had been building between John L. Vassallo Jr. and his stepdaughter Melinda (and her daughters) based on a criminal allegation against Vassallo's stepson.  The tension eventually came to a head when Vassallo confronted Melinda in a courthouse hallway and assaulted Melinda's daughters (Vassallo's step-granddaughters), Lauren Welborn and Mary Jaco.  Vassallo was charged and eventually convicted of assault against Welborn and Jaco.

Vassallo appeals his convictions for two counts of fourth degree assault (domestic violence).  He makes six arguments: (1) the trial court improperly instructed the jury regarding its self-defense instruction and its first aggressor instruction, (2) he received ineffective assistance of counsel because his defense counsel proposed these erroneous instructions, (3) the trial court erred by admitting evidence that was barred under ER 404(b), (4) the State committed prosecutorial misconduct both by the manner it questioned a witness and by characterizing her responses as "evasive" at closing argument, (5) there

is insufficient evidence to designate his convictions as crimes of domestic violence because his relationship with the victims does not qualify under the statutory definition, and (6) his Second Amendment rights were violated when he lost his firearm rights as a result of his domestic violence misdemeanor convictions.

We affirm.

## FACTS

In November 2023, Vassallo met his wife Patricia at the local county courthouse after she had just attended the sentencing hearing of his stepson, Joseph Cordell. Cordell had pleaded guilty to sending sexually explicit messages to Vassallo's step-granddaughter, B.R. (who was also Cordell's niece). Also present at the courthouse in a separate group was B.R., Melinda, Vassallo's stepdaughter (and B.R.'s mother), and Melinda's other daughters, Welborn and Jaco.[1]

During Cordell's sentencing hearing, B.R., Melinda, and Welborn all spoke and requested higher sentences than what the State was recommending as part of the plea agreement. Following their statements, the superior court sentenced Cordell to a sentence that was twice the State's recommendation.

The statements likely stoked already growing tensions within the family. While Melinda, Welborn, and Jaco all supported Cordell's prosecution, Vassallo and Patricia believed that Cordell had been wrongfully accused, and they blamed Melinda and her

---

[1] Because Patricia and Melissa share Vassallo's last name, we refer to them by their first names to avoid confusion.

daughters. Over the course of Cordell's case, communication among the family had largely broken down.

After the sentencing hearing, Melinda, her daughters, and a few additional individuals left the courtroom and waited in the hallway for the detective who had been working on B.R.'s case.

Video footage from the courthouse hallway surveillance camera captured what happened next. Melinda's group is standing at one end of the hallway, while Melinda herself is sitting on a bench off to the side against the wall. At some point, Vassallo enters the hallway at the far end and walks toward Melinda. When Vassallo arrives, he stands directly over the seated Melinda, leans toward her and aggressively sticks his finger toward her face. Melinda responds by putting her hand up.

At that point, Welborn comes up along the wall to Vassallo's right side, puts her hand on Vassallo's arm, and appears to try to move her body between Vassallo and Melinda. Vassallo reacts by forcibly shoving Welborn against the wall. With this shove, Vassallo appears to shift his attention to Welborn, pushing her into the wall again, but this time, he puts his forearm against her upper chest and neck. Jaco then quickly approaches Vassallo's left side and tries to push Vassallo away from Melinda and Welborn. Melinda stands up and tries to help Jaco push Vassallo away. Vassallo appears to be trying to push back at the women when court security arrives and tackles Vassallo to the ground.

Because the incident took place in a courthouse, the State charged Vassallo with three counts of third degree assault, one count each for assaulting Melinda, Welborn, and

3

Jaco.[2]  All counts were charged as crimes of domestic violence for being against family or household members.  The information was later amended to drop the charges for Vassallo's assault of Melinda.

Vassallo's case proceeded to a jury trial.

I.  STATE'S MOTION IN LIMINE TO ADMIT EVIDENCE UNDER ER 404(b)

Prior to trial, the State filed a motion in limine asking the court to allow, under ER 404(b), Melinda and her daughters to testify about how Cordell's prosecution "led to a shattering of the relationships between [Vassallo and Patricia] and Melinda/her children." Clerk's Papers (CP) at 55.  The State argued that this testimony would explain Vassallo's motive by providing a background of the growing hostility between Vassallo and the victims that led to this incident.

At a hearing on the motion, defense counsel responded that they were unopposed "to limited evidence being offered by the [S]tate to explain why everybody was [at the courthouse]."  1 Verbatim Rep. of Proc. (VRP) at 95.  But they argued that the level of detail of the State's backstory was prejudicial because it would be "accusing [Vassallo] in essence of being a co-conspirator to a sex offense."  1 VRP at 95.  Instead, defense counsel suggested,

> I believe the appropriate way to go is to have the jury listen to the fact that, yes, everybody was here because a family member was being sentenced and that's it.  I don't think that going into the nature of the allegations and how it allegedly split the family, it goes far beyond what the probative value is in explaining that, yes, everybody was here for a court proceeding involving

_____

[2] Assault in the third degree can include an assault "in a courtroom, jury room, judge's chamber, or any waiting area or corridor immediately adjacent to a courtroom, jury room, or judge's chamber" while such locations were in use.  RCW 9A.36.031(1)(k).

4

a family member, story over. I think anything beyond that is unduly prejudicial and should not be admitted.

1 VRP at 95-96.

The State replied that they sought to admit this testimony not just to "explain why they're here," but also "to explain the background of the hostility." 1 VRP at 96. The State said,

I think we're entitled to show the story of what exactly led to that and the motivation which does go to his criminal intent and state of mind . . . . I think we're entitled to give some degree of back story in terms of showing the motive for committing this crime.

1 VRP at 97.

The trial court granted the State's motion. It agreed that there were two purposes for the testimony—res gestae ( to explain "why the parties were obviously in court here that day, that they weren't just up here loitering around and something had happened") and ER 404(b) information (to explain "a little bit deeper as to the divide that [Cordell's] underlying criminal offense caused between family members in this case"). 1 VRP at 97.

As for ER 404(b), the trial court went through four considerations. First, it explained that the State had met its burden of proving that the acts occurred by a preponderance of the evidence. Second, the trial court stated that the non-propensity purpose of the evidence was to show Vassallo's motive, specifically how Cordell's case led to Vassallo "disassociating himself" from Melinda and her daughters and to illustrate "the kind of ill will or animosity between the parties." 1 VRP at 98-99. Third, the trial court determined that the testimony was relevant to showing Vassallo's motive because it explained how Cordell's case led to different "feelings about the charging of [Cordell]"

5

and the resulting "breakdown of the relationships" within the family. 1 VRP at 98-99. And

finally, the trial court concluded that the relevance outweighed the prejudice, explaining,

> [A]s with all evidence it has a prejudicial effect, but I can't find that that
> prejudice unduly outweighs the probative value of describing that there had
> been some animosity between the parties and some reason for this to occur,
> rather than just kind of happenstance that it just kinda blew up out of nothing
> that day, that there was this underlying tension between the parties . . . when
> this incident did occur . . . .

1 VRP at 100.

The trial court carved out some limitations on the evidence, however. It excluded

any testimony about the specific nature of the crime Cordell committed against B.R. or the

length of Cordell's sentence. But it expressly allowed testimony about the following: (1)

that Cordell had pleaded guilty to committing a crime against B.R., (2) that as a result,

there was a divide between Vassallo and Patricia and Melinda and her daughters, and

Vassallo "had indicated [that] he didn't essentially want to have anything to do with

[Melinda or her family]," (3) that Melinda had wanted a restraining order against Cordell,

(4) that Vassallo had threatened to file criminal charges against Melinda and her family if

they drove by his house, (5) that Vassallo had threatened to file criminal charges against

Melinda for preventing her disabled adult son from visiting him and Patricia, (6) that

Melinda and her daughters "were unhappy with the [sentencing] recommendation made by

the [S]tate," and (7) that both groups attended Cordell's sentencing hearing. 1 VRP at 100,

103.

II. TRIAL TESTIMONY

A. LAUREN WELBORN'S TESTIMONY

Welborn provided her account of the day of the sentencing hearing and the altercation with Vassallo. Following Cordell's sentencing, Welborn suggested that she, Melinda, and her sisters leave the courtroom because she "didn't want there to be any type of interaction that was unwanted or any words that were said that were unwanted or inappropriate" between her group and Patricia. 1 VRP at 430-31.

> She explained that while they were in the hallway, she saw Vassallo arrive.

> My grandfather showed up maybe a couple minutes later. He was not present for the sentencing of [Cordell]. He saw us at the end of the hallway and he looked at us and he made a motion with his hands, as to kind of wave us away, and then I didn't think anything would come out of that.

1 VRP at 431. However, she then saw him walk over to confront Melinda.

> [Vassallo] walked over to her and did not acknowledge anyone else and he just said, ["]I hope you're pleased with yourself, you little cunt["] and he pointed his finger in her face.

1 VRP at 432. She described Vassallo's demeanor as "very aggressive, very angry," and "out of character for him." 1 VRP at 433. She explained, "It's not the person that raised me, it's not the actions I would think he would do, very aggressive." 1 VRP at 433.

Welborn said that after Vassallo confronted Melinda, Welborn put her hand on Vassallo's arm to create "space" between them. She denied "pushing" Vassallo, stating "I did not do anything other than try to create distance between [Melinda and Vassallo]." 1 VRP at 438.

Vassallo reacted by telling Welborn to "get off" of him and "pushed [her] and then he used his elbow to kind of push [her] into the wall." 1 VRP at 434. Welborn described how Jaco then told Vassallo to "not touch [her] sister" and the two of them began to engage in a "scuffle." 1 VRP at 438. Eventually court security arrived and took Vassallo to the ground and dispersed the family. The jury viewed footage from the courthouse video camera that was consistent with Welborn's description of the events.[3]

B.  JOHN VASSALLO'S TESTIMONY

Vassallo took the stand in his own defense and testified that he was surprised that things escalated and that he was just trying to defend himself. He admitted that he approached Melinda in the courtroom's hallway and called her a "lying, fucking cunt" while pointing his finger in her face. 2 VRP at 529. He explained that he wanted to "shar[e] the ache that [he] had in [his] heart" and to "hurt" Melinda. 2 VRP at 529. Although he admitted that his decision to go up to Melinda was "poor judgment," he explained that it was consistent with his upbringing.

> [Defense counsel:] Do you feel that you pointing at Melinda was consistent with the way you were raised?
>
> [Vassallo:] Yeah, as far as not hitting up a notch and putting my finger in her chest or facetiously slapping her on the shoulder or anything like that, yeah, I maintained my distance and if anything, if anything, I would've expected that day, was for her to go tell me to go screw myself, verbally and I would've said thank you very much and I would've left.

2 VRP at 534.

---

[3] Melinda and Jaco also testified consistently with Welborn, including the details of the verbal exchange between Melinda and Vassallo.

Vassallo said that he was "surprised" by the events that followed. 2 VRP at 530. He remembered suddenly feeling "somebody" coming to grab both his arms and that he did not realize that it was Welborn. 2 VRP at 530. He reacted by taking his arm out of her grip, that "wasn't a strong grip," and proceeding to shove Welborn away from him into the wall. 2 VRP at 530.

Vassallo characterized his actions as his attempt to "make space" between himself and "the person attacking [him]." 2 VRP at 530. He explained that he was confused why Welborn thought that he was going to "use physical anything on any of them" and that he just wanted to defend himself. 2 VRP at 531.

C. PATRICIA VASSALLO'S TESTIMONY

Vassallo's wife, Patricia, testified that she had been married to Vassallo for 39 years and that Melinda was her biological daughter. Patricia explained that Vassallo was Melinda's stepfather, but he had never legally adopted Melinda.

Patricia testified that Vassallo was running late and missed Cordell's sentencing. At the end of the sentencing, Patricia watched Melinda and her daughters leave the courtroom. Because of the "strain" in the family over Cordell's case, Patricia claimed that she "stayed back" so that she could avoid interacting with them. 1 VRP at 494-95. When Patricia eventually left and entered that hallway, she saw Vassallo had finally arrived and was going through security. She suggested that they just leave because Vassallo had already missed the hearing.

Defense counsel asked Patricia if she had known whether Vassallo had planned to confront Melinda before he did. Patricia denied knowing of any plan.

9

On cross-examination, the State revisited the topic of what Patricia knew about Vassallo's plans. The State referenced conflicting testimony from a court security officer who testified that he had heard Patricia say, "I knew he was going to do something, I told him don't do anything, I just knew it." 1 VRP at 495-96. Then the following exchange took place:

> [State:] [W]ere you aware the courtroom security officer, in his report, said that he heard you say those words?
>
> [Patricia:] Yes, I'm quite aware, I read his statement.
>
> [State:] Okay and was there something else you said[] that maybe he mistook that for, or?
>
> [Patricia:] I believe he did mistake it, because a person, individual, that was here, had wanted to go toward the elevator to leave and I had said, don't go over there, all you're gonna do is cause trouble, because she has a tendency to act inappropriate.
>
> . . . .
>
> [State:] So, how would that relate to your saying; ["]I knew he was going to do something, I told . . .[")
>
> [Patricia:] I never said he was going to do something.

1 VRP at 496-97. Patricia explained that the only time she expressed "anything about something happening" was when she told someone that she "had a feeling that something was gonna happen because of all the animosity." 1 VRP at 497.

The State then circled back to press Patricia about what the security officer had overheard:

> [State:] All right, so again I'm coming back to this; ["]I knew he was gonna do it.["] How did [the security officer] hear those words?

1 VRP at 499. Vassallo's counsel objected on the basis of speculation, which the trial court sustained. The State then asked a similar, but different question.

> [State:] So, was there anyone else that you heard say that statement, that may have gotten it confused?
>
> [Patricia:] I don't know.

1 VRP at 500. Defense counsel objected again as to the "form of the question." 1 VRP at 500. The trial court sustained the objection, telling the prosecutor to "restate" the question. 1 VRP at 500.

When the prosecutor tried again with a rephrased question, defense counsel objected again. But this time, the trial court allowed the question.

> [State:] Is there any other way that you can explain how the officer would've heard you . . . ?
>
> [Defense counsel:] Objection, relevance and again—
>
> [Patricia:] There were several people in that hallway.
>
> [Defense counsel:]— calls for speculation.
>
> . . . .
>
> [Trial court]: Overruled.
>
> [State:] Do you have an explanation for that?
>
> [Patricia:] There were several people running around there.
>
> [State:] Someone else might've said that, you're saying?
>
> [Patricia:] Somebody else might have said it, I didn't.

2 VRP at 504.

Later during the cross-examination, the prosecutor asked Patricia about whether she knew what Vassallo's views were about Cordell's prosecution. Defense counsel's objection for speculation was sustained.

> [State:] Isn't it true that [Vassallo] was opposed to the prosecution of your son, . . . Cordell?
>
> [Defense counsel:] Your honor, I'm going to object as far as calling for speculation of my client and I believe are also pushing the bounds of the court's earlier rules.

11

[Trial court]: Sustained.

2 VRP at 509-10.

Following this objection, the prosecutor continued to ask Patricia a series of similar questions, apparently seeking testimony about the family animosity, which resulted in a series of objections from defense counsel. The prosecutor started with Patricia's views about Cordell's prosecution.

> [State:] I'm going to ask this again, yes or no, you opposed the prosecution of Mr. Cordell, right, yes, or no?
> [Patricia:] I did not oppose the prosecution if my son would have been guilty.

2 VRP at 513. Defense counsel appeared to be concerned about the testimony straying into facts about the Cordell prosecution, and he objected several times based on limiting narrative or nonresponsive answers. The trial court overruled defense counsel's objections but told Patricia that she needed to "answer just the questions that are asked" and that she would be told if she needed to provide more information. 2 VRP at 513. The prosecutor then continued their questioning.

> [State:] Yes or no, you were opposed to the prosecution of Mr. Cordell?
> [Patricia:] I guess if you break it all down, yes, I kind of was.

2 VRP at 514. Then, the prosecutor shifted to Vassallo's views.

> [State:] Okay and that was true of your husband too, right?
> [Defense counsel:] Objection as to speculation of Mr. Vassallo.
> [Trial court:] Sustained.
> [State:] Do you know what your husband's position was about Mr. Cordell's sentencing?
> [Patricia:] Not until I spoke to him later.

[State:] Okay and did you find out what that position was then?

[Patricia:] Eventually.

[State:] And what was that position, yes or no, opposed to it or was he for it?

[Patricia:] Well, I can't say oppose or against because he's conflicted.

2 VRP at 514. Defense counsel objected to Patricia providing "any further response," which the trial court overruled. The prosecutor continued:

[State:] Was he opposed or was he for it?

[Patricia:] I didn't really ask him about that, how he felt as far as he was opposed or against. I just knew that my husband was upset and he was hurt.

2 VRP at 515.

III. JURY INSTRUCTIONS

Following the presentation of evidence, the trial court conferred with the parties about the proposed jury instructions. Both parties submitted a set of proposed instructions, and the trial court observed that the sets were very similar and "essentially mirror[ed]" each other. 2 VRP at 555.

Part of Vassallo's defense was that he acted in self-defense. Accordingly, using a self-defense instruction that followed the pattern form, the trial court gave instruction 17:

The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.

The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

13

CP at 97.[4]

Related to self-defense, both parties, including defense counsel, requested a first

aggressor instruction.  Consistent with this request, the trial court instructed the jury that if

the defendant is the first aggressor in a physical altercation, they cannot later claim self-

defense.  Instruction 21, which also followed the pattern form, provided:

> No person may, by any intentional act reasonably likely to provoke a
> belligerent response, create a necessity for acting in self-defense and
> thereupon use force upon or toward another person.  Therefore, if you find
> beyond a reasonable doubt that the defendant was the aggressor, and that
> defendant's acts and conduct provoked or commenced the fight, then self-
> defense is not available as a defense.  Words alone are not adequate
> provocation for the defendant to be the aggressor.

CP at 101.

Given that the State's information charged each count as a crime of domestic

violence, the trial court also instructed the jury that if it found Vassallo guilty of any of the

State's assault charges that it must also determine whether "the defendant committed the

crime or crimes against a family or household member."  CP at 102.  The instructions

defined "a family or household member" as

---

[4] The language used in the jury instructions is nearly identical to the language in
Washington's self-defense statute, RCW 9A.16.020:

> The use, attempt, or offer to use force upon or toward the person of another
> is not unlawful in the following cases:
>
> . . . .
>
> (3) Whenever used by a party about to be injured, or by another lawfully
> aiding him or her, in preventing or attempting to prevent an offense against
> his or her person . . . in case the force is not more than is necessary.

adult persons related by blood or marriage, adult persons who are presently residing together or who have resided together in the past, or persons who have a biological or legal parent-child relationship, including stepparents and stepchildren and grandparents and grandchildren.

CP at 103.

For each of the instructions discussed above, defense counsel proposed a comparable instruction and made no objection to any of the versions given by the trial court.[5]

IV. STATE'S CLOSING ARGUMENT

During closing argument, the State referenced back to Patricia's testimony and questioned her credibility, characterizing her manner on the stand as, among other things, evasive.

There are certain tools you can make and I'm allowed to make some arguments about it, but ultimately you make the determination in this, but one of the things it does say in your instructions and again, there's a catch all to any other factor you can use to evaluate testimony, the credibility of testimony, but one of the things it says here is, it says; the manner of the witness while testifying. That's one of the things that you could choose. So, I would submit to you that . . . *Patricia Vassallo's manner when testifying, both on direct but particularly on the cross*[-]*examination, was evasive, . . . kind of refusing to answer questions directly, defensive. For instance, dancing around it, not answering questions about how her husband felt about Mr. Cordell's prosecution or how the family cut each other off, the manner was evasive and defensive.*

2 VRP at 594-95 (emphasis added).

---

[5] Because all slight language differences in defense counsel's proposed instructions are irrelevant to Vassallo's arguments in this appeal, we do not set forth their language separately.

V.  VERDICT AND SENTENCING

After deliberations, the jury found Vassallo guilty of two counts of the lesser

included charges of fourth degree assault.  The jury also determined that the victims, Jaco

and Welborn, met the definition of "family or household member."

At sentencing, the family expressed "no desire" for Vassallo to spend time in jail,

so the State recommended 364 days on each count, run consecutively, and to suspend all

but 15 days which Vassallo could fulfill by completing 120 hours of community service.

The State also asked the trial court to order a mental health evaluation including counseling,

medication, and potential anger management treatment.

The State went on to say that due to the nature of Vassallo's convictions, it "[wa]s

a mandatory case where he loses his right to possess a firearm."  2 VRP at 677.  The State

explained:

> No firearms were involved in the incident, however there were a number of
> firearms that were turned into the sheriff, so obviously he'd have to find
> some way to give those to someone, although that's, I know, beyond the
> scope of what we're dealing with today, but he does lose his right to possess
> firearms or to own firearms.

2 VRP at 677-78.

Defense counsel did not present a separate sentencing recommendation and merely

asked the trial court to impose the State's recommended sentence.

The trial court generally agreed with the parties.  It sentenced Vassallo to 364 days

on each count, run concurrently, and ordered all other recommendations.  But it gave

Vassallo a suspended sentence of 10 days (instead of 15 days) or 80 hours of community

service (instead of 120 hours of community service).  In addition to explaining to Vassallo

his sentence, the trial court also notified Vassallo that he had lost his right to own or possess a firearm.

At the conclusion of the hearing, the trial court signed the judgment and sentence and a separate order for Vassallo to relinquish his firearms.

Vassallo appeals.

ANALYSIS

Vassallo makes multiple arguments, including: (1) that the trial court erred when it instructed the jury on self-defense and first aggressor, (2) that his counsel was ineffective for proposing these instructions, (3) that the trial court abused its discretion when it admitted testimony about Cordell's crimes against B.R., (4) that the State committed prosecutorial misconduct both during its cross-examination of Patricia and, later, during closing argument when it discussed her testimony, (5) that the victims, as step-granddaughters, do not qualify as family or household members, and (6) that the loss of his access to firearms violates his Second Amendment rights.

I. THE COURT'S JURY INSTRUCTIONS

Vassallo alleges two errors related to the trial court's jury instructions. First, he argues that the self-defense instruction misstated the law and relieved the State of its burden "to disprove self-defense for situations where the defendant reasonably feared an offensive touching." Appellant's Opening Br. at 44. Second, he argues that the trial court erred in giving the jury a first aggressor instruction when the instruction was unsupported by sufficient evidence. We do not consider either of these arguments because the errors, if any, were invited.

17

The invited error doctrine precludes review of an error that the defendant invited at trial, even if the error is one of constitutional rights. *State v. Holmes*, 31 Wn. App. 2d 269, 288, 548 P.3d 570, *review denied*, 3 Wn.3d 1024 (2024). Invited error doctrine applies when a party proposes a jury instruction and later assigns error to it. *State v. Tatum*, 23 Wn. App. 2d 123, 128, 514 P.3d 763, *review denied*, 200 Wn.2d 1021 (2022).

Vassallo proposed jury instructions that were, in all relevant respects, identical to the trial court's instructions to the jury. By specifically proposing these instructions, Vassallo invited the error about which he now complains. *See id.* Thus, we do not review his arguments.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Relatedly, Vassallo argues that he received ineffective assistance of counsel because his defense counsel proposed the flawed self-defense and first aggressor instructions. We disagree.

"An appellant may challenge a jury instruction that [they] proposed if it is in the context of an ineffective assistance claim." *State v. Johnson*, 172 Wn. App. 112, 128-29, 297 P.3d 710 (2012), *aff'd in part, rev'd in part on other grounds*, 180 Wn.2d 295 (2014). In such cases, "the invited error doctrine does not preclude review." *State v. Kyllo*, 166 Wn.2d 856, 861, 215 P.3d 177 (2009).

To prevail on an ineffective assistance of counsel claim, the petitioner must show (1) that counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024). An ineffective assistance of counsel claim fails if the petitioner fails to satisfy either prong of the inquiry.

*In re Det. of B.R.*, 31 Wn. App. 2d 529, 546, 555 P.3d 435 (2024).  We need not consider

both prongs if the petitioner fails to satisfy one.  *Id.*

Counsel's performance is deficient if it falls below an objective standard of

reasonableness.  *Bertrand*, 3 Wn.3d at 128.  We strongly presume that counsel's

performance was reasonable.  *Id.*  Generally, counsel's performance is not deficient when

counsel's conduct can be characterized as a legitimate trial strategy or tactic.  *Id.*

To show prejudice, the defendant must demonstrate a reasonable probability that

the outcome of the proceeding would have been different if counsel had not performed

deficiently.  *Id.* at 129.

A.  SELF-DEFENSE INSTRUCTION

Vassallo argues that he received ineffective assistance of counsel because his

defense counsel's proposed instruction on self-defense misstated the law, resulting in him

being "deprived . . . of his right to present a defense, his right to a fair trial, and his right to

due process."  Appellant's Opening Br. at 43.

> The use of force on another person is lawful
>
> [w]henever used by a party about to be injured, or by another lawfully
> aiding him or her, in preventing or attempting to prevent an offense against
> his or her person, or a malicious trespass, or other malicious interference
> with real or personal property lawfully in his or her possession, in case the
> force is not more than is necessary.

RCW 9A.16.020(3).

Vassallo contends this statute is broader than the instruction that his counsel

proposed.  Based on the statute's plain language, Vassallo contends it should be construed

in three separate segments—each of which allows a different situation in which an

individual may claim self-defense. According to Vassallo, a person may use "a reasonable amount of force" if it is (1) "to prevent injury to oneself or the person of another," (2) "to prevent an offensive battery to oneself," or (3) "to defend one's own property." Appellant's Opening Br. at 35. And, based on this construction, Vassallo contends he was entitled to self-defense under the second situation, because when he pushed Welborn as she came up behind him and touched his arm, it was to reasonably prevent Welborn's offensive touching.

Vassallo contrasts the statute to the instruction his trial counsel proposed; he argues that the proposed instruction, which followed the pattern instruction, stated that Vassallo could claim that he acted in self-defense only if he reasonably believed he was about to be injured by connecting the phrases " 'about to be injured' " and " 'in preventing an offense of his or her person' " into a single clause. Appellant's Opening Br. at 38. Vassallo contends this is too high of a bar when the statute would permit self-defense merely "to prevent offensive battery" to himself. Appellant's Opening Br. at 35. He argues that the deficiency in his counsel's proposed instruction was "obvious" and could have been resolved by "simply examin[ing] the long-standing self-defense statute and common law." Appellant's Opening Br. at 55.

Vassallo also argues that his counsel's error prejudiced the outcome of his case because the "[e]vidence at trial showed that []Welborn's unconsented touching of []Vassallo's arm did not carry a reasonable probability of injury." Appellant's Opening Br. at 56. Thus, by incorrectly stating that the law required Vassallo to have reasonable

fear of injury, counsel precluded Vassallo from claiming self-defense and lowered the State's burden of proof.

But even if we were to assume Vassallo's attorney's conduct was deficient (when they proposed an instruction that was consistent with the Washington Pattern Jury Instructions), Vassallo has failed to show prejudice. Regardless of whether Vassallo was required to have reasonable fear of injury or whether just the prevention of an unlawful touching, Vassallo's force was required to be proportionate and "not more than is necessary." RCW 9A.16.020(3). No reasonable juror could find that Vassallo's use of force was proportionate to the actions of either of the victims. As the video footage and testimony from multiple witnesses show, Vassallo aggressively shoved Welborn twice against a wall, once with his forearm across her chest and throat. He then lunged towards Jaco, shoving her arms and chest. Especially considering the victims' modest statures and Vassallo's larger size, his use of force was significantly more than necessary. Thus, even if Vassallo's counsel's proposed instruction had been consistent with his view of the statute, Vassallo has not demonstrated a reasonable probability that the outcome of the proceeding would have been different. *See Bertrand*, 3 Wn.3d at 129. Vassallo's ineffective assistance of counsel claim related to the self-defense instruction fails. *See B.R.*, 31 Wn. App. 2d at 546 (an ineffective assistance of counsel claim fails if the individual bringing such claim cannot prove *either* deficient performance or prejudice).

B. FIRST AGGRESSOR INSTRUCTION

Vassallo also argues that he received ineffective assistance of counsel when his counsel proposed a first aggressor instruction even though such instruction was "factually inappropriate" and unsupported by sufficient evidence. Appellant's Opening Br. at 46.

A defendant cannot claim that they acted in self-defense if they were the initial aggressor or the one who provoked an altercation. *State v. Sullivan*, 196 Wn. App. 277, 289, 383 P.3d 574 (2016), *review denied*, 187 Wn.2d 1023 (2017). "Although not favored, an aggressor instruction is proper 'where (1) the jury can reasonably determine from the evidence that the defendant provoked the fight, (2) the evidence conflicts as to whether the defendant's conduct provoked the fight, or (3) the evidence shows that the defendant made the first move by drawing a weapon.' " *Id.* (internal quotation marks omitted) (quoting *State v. Stark*, 158 Wn. App. 952, 959, 244 P.3d 433 (2010)). The provoking action must be reasonably likely to provoke a belligerent response—words alone are not enough. *Id.* at 289-90.

Vassallo argues that there is insufficient evidence to support this instruction because his actions of walking up to Melinda, pointing his finger at her, and insulting her with vulgarities were insufficient to justify a belligerent response from Welborn. While Vassallo acknowledges that his conduct was "offensive" and "provocative," he contends that they should have provoked only anger in Welborn, not fear that Vassallo was going to assault Melinda. Appellant's Opening Br. at 50. Thus, his actions were insufficient to justify Welborn touching his arm without his consent. Because his counsel's erroneous

first aggressor instruction precluded him from claiming self-defense, Vassallo argues that he was prejudiced by their deficient conduct.

As with the self-defense instruction, we disagree that Vassallo can show prejudice. As discussed above, even assuming that he was not the first aggressor, no reasonable juror could find that Vassallo's reaction was in self-defense. Thus, Vassallo has not demonstrated a reasonable probability that the outcome of the proceeding would have been different. *See Bertrand*, 3 Wn.3d at 129. Vassallo's ineffective assistance of counsel claim related to the first aggressor instruction fails. *See B.R.*, 31 Wn. App. 2d at 546.

III. ADMISSION OF TESTIMONY UNDER ER 404(b)

Vassallo argues that the trial court abused its discretion when it granted the State's motion in limine under ER 404(b) and allowed Melinda, Welborn, and Jaco to testify about Cordell's prosecution and how it led to a dispute between them and Vassallo. We disagree.

We review a trial court's decision to admit evidence for an abuse of discretion. *State v. Kelly*, 32 Wn. App. 2d 241, 264, 555 P.3d 918 (2024). Even if we may have resolved the issue differently, we do not substitute our opinion for that of the trial court. *State v. W.H.*, 33 Wn. App. 2d 785, 791, 564 P.3d 992 (2025). For the trial court to abuse its discretion, it must have adopted a view that no reasonable person would take—its decision must have been based on untenable grounds or reasons, the incorrect legal standard, or unsupported facts. *In re Guardianship of F.S.*, 33 Wn. App. 2d 24, 35, 559 P.3d 138 (2024), *review denied*, 4 Wn.3d 1015 (2025).

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b). ER 404(b) bars

evidence of a person's character to show that person acted in conformity with that character in the current instance. *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). But that same character evidence may be admitted for another purpose, such as motive or intent. *Id.*

Before admitting ER 404(b) evidence, a trial court must, on the record, " '(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.' " *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). ER 404(b) must be read in conjunction with ER 403, which " 'requires exclusion of evidence, *even if relevant*, if its probative value is substantially outweighed by the danger of unfair prejudice.' " *State v. Olsen*, 175 Wn. App. 269, 280, 309 P.3d 518 (2013) (quoting *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986)), *aff'd on other grounds*, 180 Wn.2d 468, 325 P.3d 187 (2014).

Under ER 404(b), " 'evidence of quarrels between the victim and the defendant preceding a crime, and evidence of threats by the defendant, are probative upon the question of the defendant's intent.' " *State v. Powell*, 126 Wn.2d 244, 261, 893 P.2d 615 (1995) (quoting *State v. Parr*, 93 Wn.2d 95, 102, 606 P.2d 263 (1980)).

Here, Vassallo argues that the trial court erred by allowing testimony about Cordell's prosecution as evidence of motive under ER 404(b). Vassallo contends the testimony was irrelevant to his motive because the testimony included "the acts and

thoughts belonging to someone else." Appellant's Opening Br. at 64. Vassallo contends that "the only purpose of these facts was to buttress the veracity of the accusations against []*Cordell* and assail []Vassallo's character because he sympathized with []Cordell, a domestic abuser." Appellant's Opening Br. at 65.

We disagree that the trial court abused its discretion. Evidence, in at least some detail, about Cordell's prosecution and the resulting family rift was clearly relevant to explain not only the location of the incident but also the relationships of the participants and the intensity of the interaction, which would include the motives of Vassallo to behave as he did. Our review of the record shows that the trial court appropriately undertook the four steps of the ER 404(b) analysis to make the determination of what aspects of the story should have been admitted and what should have been excluded.

To be sure, a direct linkage of Vassallo to Cordell's crime against a minor would be prejudicial. But here, in its final step under the ER 404(b) analysis, the trial court acknowledged Vassallo's concerns over prejudice and balanced the possibility of prejudice with the evidence's relevance to motive by barring the most prejudicial aspects—the details of Cordell's crimes and the length of his criminal sentence. Although different judges may have sculpted the boundaries of the evidence differently, we cannot say that no reasonable judge would have drawn the line in the same place as the trial court. *See F.S.*, 33 Wn. App. 2d at 35. Thus, the trial court did not abuse its discretion when it admitted this evidence.

IV. PROSECUTORIAL MISCONDUCT

Vassallo next argues that the State committed prosecutorial misconduct both during the cross-examination of Vassallo's wife Patricia and, again, during closing argument. He

alleges that during Patricia's cross-examination, the prosecutor improperly questioned her about Vassallo's "plans" to confront Melinda (based, in part, on the alleged statements from the court security staff) and about Vassallo's "feelings about the Cordell prosecution." Then, during closing arguments, Vassallo claims the State mischaracterized Patricia's answers as "evasive." We disagree.[6]

In a prosecutorial misconduct claim, the defendant bears the burden of showing that the prosecutor's conduct was improper and prejudicial. *State v. Houser*, 30 Wn. App. 2d 235, 271, 544 P.3d 564, *review denied*, 3 Wn.3d 1015 (2024). We first evaluate whether the prosecutor's conduct was improper. *Id.* It is improper if a prosecutor's "cross[-]examination is designed to compel a witness to express an opinion as to whether other witnesses were lying." *State v. Padilla*, 69 Wn. App. 295, 299, 846 P.2d 564 (1993).

During closing argument, a prosecutor has wide latitude to make reasonable inferences from the evidence presented at trial. *State v. Rodriguez-Perez*, 1 Wn. App. 2d 448, 458, 406 P.3d 658 (2017), *review denied*, 190 Wn.2d 1013 (2018). Reasonable inferences can include commentary on a witness's demeanor at trial, manner of testimony, or credibility. *Id.* at 458, 460. "Misconduct occurs only when it is clear and unmistakable that the prosecutor is not arguing an inference from the evidence but is expressing a personal opinion." *Id.* at 460.

---

[6] Vassallo also contends that the State committed prosecutorial misconduct during closing argument by referencing the evidence that was admitted consistent with the trial court's motion in limine ruling discussed above. Because we have decided that the admission of such evidence was admissible, we do not address this issue.

If the prosecutor's conduct was improper, we then determine if the conduct prejudiced the defendant. *Id.* at 458. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id.*

Related to Patricia's cross-examination, Vassallo argues that the State committed misconduct twice—in questioning about the security officer, and in questioning about Vassallo's feelings about the Cordell prosecution. First, Vassallo contends that when the prosecutor repeatedly asked Patricia about the security officer's statement which suggested that she had known that Vassallo had planned to confront Melinda, "[t]here was no reason for the prosecutor to continue to hound her . . . unless he was hoping to bait her into a comment on the veracity of the . . . security officer." Appellant's Opening Br. at 73-74. And second, the prosecutor knew it was improper to "repeatedly asked Patricia to comment about Mr. Vassallo's feelings about the Cordell prosecution," because the trial court initially agreed with defense counsel that the prosecutor's questioning was "speculative." Appellant's Opening Br. at 74.

Vassallo also separately argues that the State compounded its misconduct at closing argument when, while referring to the prosecutor's repeated questioning at cross, the State "capitalized" on Patricia's failure to answer by characterizing her testimony as " 'evasive and defensive' " and " 'dancing around' " the prosecutor's questions. Appellant's Opening Br. at 75. Vassallo contends that this greatly mischaracterized Patricia's responses because she was not being evasive, she "did not answer these questions because *all* of the prosecutor's questions were sustained for their impropriety." Appellant's Opening Br. at

27

75 (emphasis added). According to Vassallo, this misconduct caused the jury to unfairly question the credibility of Patricia and thus prejudiced his case.

We are unpersuaded that the State committed misconduct either during its cross-examination of Patricia or in its closing argument. Looking at the cross-examination in context, the repetition of similar, but different, questions was not about "hounding" the witness. From the changes in the phrasing of the questions following each of Vassallo's objections, it is evident that the prosecutor was trying to modify their questions to both elicit the testimony they sought, while also complying with the rules of evidence and the parties' motions in limine. Their occasional struggle to do so does not equate to misconduct.[7]

Regarding closing argument, we also disagree that the prosecutor's reference to the arguable evasiveness of Patricia's manner of testifying was improper. Vassallo highlights comments that appear to be based on inferences that the prosecutor made from Patricia's observable demeanor on the stand. And there were points where Patricia did not directly answer the prosecutor's questions—even defense counsel objected to her responses, apparently to keep her focused on the precise question that was asked. And when the prosecutor attempted to ask Patricia about Vassallo's thoughts about the Cordell

---

[7] Vassallo suggests that the State's misconduct is partially rooted in the prosecutor "persist[ing]" in asking improper questions during Patricia's cross-examination "until the trial court made a mistake" in ruling on the defense's objections. Appellant's Reply Br. at 27. We do not view the record so cynically, nor do we necessarily agree that the trial court made "a mistake" in its ruling on objections during this questioning. Nevertheless, Vassallo has not assigned error to this alleged "mistake," so we do not address it.

sentencing, she gave arguably minimal, quasi-nonresponsive answers.[8] Vassallo blames Patricia's non-answers on the trial court sustaining objections from counsel, but viewing the record as a whole, we disagree. The prosecutor's inferences about Patricia's manner while on the witness stand appear to be reasonably traceable to her answers, not in the sustaining of objections. Indeed, a prosecutor's "wide latitude" at closing argument includes making comments, like those at issue here, on witnesses' demeanors. *Rodriguez-Perez*, 1 Wn. App. 2d at 458. We cannot conclude that the inferences drawn here during the State's closing argument were unreasonable.

Accordingly, the State's conduct during cross-examination and during closing argument was not improper. Vassallo's prosecutorial misconduct claims fail.

---

[8]    [State:] Do you know what your husband's position was about Mr. Cordell's sentencing?

[Patricia:] Not until I spoke to him later.

[State:] Okay and did you find out what that position was then?

[Patricia:] Eventually.

[State:] And what was that position, yes or no, opposed to it or was he for it?

[Patricia:] Well, I can't say oppose or against because he's conflicted.

. . . .

[State:] Was he opposed or was he for it?

[Patricia:] I didn't really ask him about that, how he felt as far as he was opposed or against. I just knew that my husband was upset and he was hurt.

2 VRP at 514-15.

V. CRIME OF DOMESTIC VIOLENCE (DV)—FAMILY OR HOUSEHOLD MEMBERS

Vassallo contends that there is insufficient evidence to support domestic violence designations for his convictions against Welborn and Jaco. He asserts that a domestic violence designation is available only if the victims of that crime are "family or household members" and that Welborn and Jaco, as step-grandchildren, do not meet that definition under the applicable statute. We disagree that there was insufficient evidence to support the DV designations for Vassallo's crimes.

A. STANDARD OF REVIEW AND RULES OF INTERPRETATION

Although Vassallo frames his challenge as being the sufficiency of the evidence, neither party contends that there are unresolved issues of Welborn and Jaco's familial status—both are adult step-grandchildren of Vassallo. Therefore, resolution of the issue turns not on the analysis of the facts, but on the interpretation of the definition of a "family or household member" in the "Domestic Violence Official Response Act" (DVRA), chapter 10.99 RCW. Whether Vassallo's crimes can be designated as crimes of domestic violence depends on whether adult step-grandchildren fall within that definition.

Interpretation of a statute's meaning or purpose is a question of law that we review de novo. *Rodriguez v. Zavala*, 188 Wn.2d 586, 591, 398 P.3d 1071 (2017). The goal is to carry out the legislature's intent. *Id.*

When practicable, we must refer to a statute's plain meaning as an expression of the legislature's intent. *State v. Lewis*, 5 Wn.3d 114, 117, 571 P.3d 1245 (2025). A statute's plain meaning is discerned from "the text of the provision itself, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a

whole." *Rodriguez*, 188 Wn.2d at 591. Undefined terms are given their " 'plain and ordinary meaning unless a contrary legislative intent is indicated.' " *State v. Brown*, 194 Wn.2d 972, 976, 978, 454 P.3d 870 (2019) (holding that defendant's interpretation of the meaning of "when required" in the statute although "conceivable" was unreasonable in part because it undermined the purpose of the traffic law and public safety) (quoting *Ravenscroft v. Wash. Water Power Co.*, 136 Wn.2d 911, 920-21, 969 P.2d 75 (1998)). "In undertaking this plain language analysis, the court must remain careful to avoid 'unlikely, absurd or strained' results." *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005) (quoting *State v. Stannard*, 109 Wn.2d 29, 36, 742 P.2d 1244 (1987)).

Only when a statute's language is ambiguous and could be *reasonably* interpreted in multiple ways do we turn to statutory construction, legislative history, and relevant case law to ascertain its meaning. *State v. Valdiglesias LaValle*, 2 Wn.3d 310, 318, 535 P.3d 856 (2023).

B.  DOMESTIC VIOLENCE DESIGNATIONS UNDER THE DVRA

Convictions that are designated as crimes of domestic violence allow victims additional protection. *See State v. Abdi-Issa*, 199 Wn.2d 163, 169, 504 P.3d 223 (2022) (explaining that a domestic violence designation allows cases to receive priority scheduling and allows the trial court to impose specialized no-contact orders). The designation does not create a new crime, nor does it change the elements of the underlying offense—instead, it emphasizes the importance of enforcing the law in a way that ensures domestic violence victims are adequately protected. *Id.* at 169-70.

For a crime to receive a domestic violence designation, the jury must make a special finding that the assault was committed "by . . . one family or household member against another . . . ." RCW 10.99.020(4). There are three definitions of "Family or household members," specifically,

(a) Adult persons related by blood or marriage;
(b) adult persons who are presently residing together or who have resided together in the past; and
(c) persons who have a biological or legal parent-child relationship, including stepparents and stepchildren and grandparents and grandchildren.

RCW 10.99.020(7).

Here, Vassallo argues that Welborn and Jaco, as step-grandchildren, do not qualify as his "family or household members" because they do not meet any of these three definitions. He contends that (1) they were not related by blood or marriage as required by the first definition, (2) they "did not live with [him] while they were adults," so they did not meet the second definition, and (3) they were not "legal stepchildren," so they did not meet the third definition. Appellant's Suppl. Assignment of Error at 5, 10.

We first turn in closer detail to Vassallo's arguments as they relate to the first definition, subsection (7)(a)—"[a]dult persons related by blood or marriage." RCW 10.99.020. While the fact that Welborn and Jaco share no blood relation with Vassallo is undisputed, Vassallo asserts that they are also not "related by . . . marriage" based on what he claims to be the "plain meaning" of subsection (7)(a). Appellant's Suppl. Assignment of Error at 6.

"Strictly construing" the statute, Vassallo contends that "adult persons 'related by . . . marriage,' " means that the alleged victim is related to another adult by blood or

where "the alleged victim married someone and thereby created a relationship with adult members of that person's family." Appellant's Suppl. Assignment of Error at 10 (alteration in original). In other words, "related by marriage" limits adult family or household members to one level of marriage: the victim's in-laws that they gain through marriage to their spouse. Thus, because Welborn and Jaco are related to Vassallo, not through their *own marriage*, but only through the marriage of their grandmother, Vassallo contends that they do not qualify as "family or household members" under subsection (7)(a).

Vassallo further appears to argue that to interpret the language in subsection (7)(a) more broadly would be "absurd" because it would greatly expand who would be considered in "family or household relationships," based on simply whether the victim was a child or an adult. Appellant's Suppl. Assignment of Error at 9. Vassallo contends that under a broad interpretation, if the victim was an adult, "family or household members" would include "step-cousins, step-aunts and step-uncles, and siblings-in-law who married the spouse's sibling;" but if the victim were a child, it would be much more limited. Appellant's Suppl. Assignment of Error at 10. The absurdity, according to Vassallo, is that "[t]he 'act' of growing up" alone would be sufficient to shift "a non-family or household member into one." Appellant's Suppl. Assignment of Error at 9 (italics omitted).

In contrast, the State asserts that a broad reading of subsection (7)(a) is more consistent with legislative intent. It contends that Vassallo's narrow construction both "subverts the plain meaning of the statute" and is unsupported by any of Vassallo's authorities. Suppl Br. of Resp't at 9. The State contends that because subsection (7)(a) does not include any restrictive language, " 'related by blood or marriage' plainly implies

broad application to encompass a variety of familial structures and relations." Suppl. Br. of Resp't at 9 (quoting RCW 10.99.020(7)(a)). Applying this broad reading, Welborn and Jaco's qualifying familial relationship is evident—they are adults and are "related by marriage"—specifically, Vassallo' marriage to their blood grandmother, Patricia.

This interpretation is supported, according to the State, by our reasoning in *State v. Garnica*. 105 Wn. App. 762, 773, 20 P.3d 1069 (2001). In *Garnica*, we held that the defendant's wife's minor sister (the defendant's sister-in-law) did not meet the definition of "family or household member" within the meaning of subsection (7)(a). *Id.* at 766. We reasoned that the sister-in-law did not meet the definition because as a minor, she was not an " '*adult* person[] related by blood or marriage.' " *Id.* at 773 (emphasis added) (quoting RCW 10.99.020). We suggested that there would have been a different result if she had been an adult because, then, she would have been a "family or household member" by subsection (7)(a)'s "plain terms," given that she was related to the defendant through her sister's marriage to him. *Id.*

According to the State, *Garnica* establishes two principles. First, that the legislature intended a victim's age to be a significant factor in determining whether their abuser is a family or household member. And second, that subsection (7)(a) should be interpreted plainly and in a way that allows a wide array of relationships to qualify a crime as a crime of domestic violence when the victim is an adult. Thus, notwithstanding Vassallo's contention that such interpretation is "absurd," the State contends that the legislature deliberately chose to make age of the victim a factor in who should be a family or household member.

We agree with the State's broader reading of subsection (7)(a) and reject Vassallo's narrow one. There is nothing in the subsection of the statute that limits qualifying family members to be individuals who are related only through one level of marriage, and we are not persuaded the legislature intended to make that distinction in the statute.

Thus, we hold that the plain language of the statute supports the finding that Welborn and Jaco were "family or household members" under the first definition because they were adult persons related by Patricia's marriage to Vassallo. The domestic violence designations attached to Vassallo's crimes were supported by sufficient evidence.

VI. SECOND AMENDMENT APPLICATION TO MISDEMEANOR DV ASSAULT

Vassallo argues that Washington's unlawful possession of a firearm statute, RCW 9.41.040, as applied to him, violates the Second Amendment of the United States Constitution.[9] He specifically challenges the provision of the statute that makes it unlawful for individuals convicted of misdemeanor domestic violence assaults and argues that as-applied to him, it "is inconsistent with our Nation's history of firearms regulation." Appellant's Amended Opening Br. at 83. We disagree.

A. ANALYTICAL FRAMEWORK FOR SECOND AMENDMENT CHALLENGES

We review constitutional challenges to the constitutionality of a statute de novo. *State v. Koch*, 34 Wn. App. 2d 232, 237, 567 P.3d 653 (2025). We start with the

---

[9] RCW 9.41.040 states in relevant part that if a person has been convicted of, among other crimes, assault in the fourth degree and their crime was committed "by one family or household member against another or by one intimate partner against another," then it is unlawful for that person to own, access, control, possess, or have custody of a firearm. RCW 9.41.040(2)(a)(i)(B).

presumption that the statute at issue is constitutional, and the challenger has the burden to prove otherwise beyond a reasonable doubt. *Id.* A party need not challenge a statute's constitutionality on its face; it may also bring a challenge "as-applied" to the specific circumstances of the case. *City of Redmond v. Moore*, 151 Wn.2d 664, 668-69, 91 P.3d 875 (2004).

It is well established that the Second Amendment's right to keep and bear arms "is among the 'fundamental rights necessary to our system of ordered liberty.' " *United States v. Rahimi*, 602 U.S. 680, 690, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (quoting *McDonald v. Chicago*, 561 U.S. 742, 778, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010). Throughout our Nation's history, the right to bear arms has played a vital role in our ability to protect and defend our liberty. *See id.* (explaining the importance of the right to bear arms for local farmers to protect themselves from soldiers during the American Revolution and for formerly enslaved individuals to protect themselves from former Confederate soldiers after the Civil War).

" 'Like most rights, though, the right secured by the Second Amendment is not unlimited.' " *Id.* (internal quotation marks omitted) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)). As much as there has been a history of protecting the right of an individual to bear arms, it has been balanced with the government's need to regulate and, at times, restrict access to firearms. *Id.* at 690-91. The Second Amendment is directed to protecting the rights of "law-abiding, responsible citizens" and thus, there has been a longstanding history of "prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626-27, 635. "Such

regulations, . . . are 'presumptively lawful.' " *State v. Hamilton*, 33 Wn. App. 2d 859, 864, 565 P.3d 595 (quoting *Heller*, 554 U.S. at 627 n.26), *review granted*, 4 Wn.3d 1037, 572 P.3d 1206 (2025).

The United State Supreme Court has articulated a two-step test to determine whether a particular firearms regulation infringes on an individual's right to bear arms. *See id.* at 866-67. First, we must engage in a textual analysis of the Second Amendment and determine whether it "covers" the individual's conduct. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). This first step involves determining whether the individual is among "the people" whom the Second Amendment protects and whether their conduct falls under the right "to keep and bear arms." *Id.*

If the plain text of the Second Amendment does not protect the individual or conduct at issue, then our analysis ends at step one. *Id.* at 18. However, if the text suggests that the individual or their conduct is among those protected by the Second Amendment, then we must proceed to step two.[10] *Id.*

---

[10] In the past, the Supreme Court has suggested the language of the Second Amendment itself includes only "ordinary law-abiding citizens," and thus, Second Amendment challenges to laws regulating firearm possession for felons could be disposed of at step one—their activities were categorically unprotected by the Second Amendment. *See Hamilton*, 33 Wn. App. 2d at 871; *see, e.g.*, *Bruen*, 597 U.S. at 31-33 (holding that is "undisputed" that "ordinary, law-abiding, adult citizens" are among those protected by the Second Amendment); *Heller*, 554 U.S. at 625, 632 (repeating that the Second Amendment protects the right to possess firearms for "law-abiding citizens"). However, more recently, in *Rahimi*, the Court presumed that the Second Amendment also protects those with felony convictions and skipped to analyze the challenged law at step two. *Hamilton*, 33 Wn. App. 2d at 870-71.

At step two, we must determine whether the government has proven its regulation is consistent with our historical and regulatory tradition. *Rahimi*, 602 U.S. at 691-92. In *Rahimi*, the Supreme Court clarified that just because this second step looks at whether a regulation is rooted in our Nation's founding, it does not mean that "a law is trapped in amber." *Id.* at 691. The Court explained that even if the firearms or regulations were not in existence at the founding, they may still meet the history and tradition requirements of the second step.

> [T]he reach of the Second Amendment is not limited only to those arms that were in existence at the founding. Rather, it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence." By that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.

*Id.* at 691-92 (internal citations omitted) (second alteration in original) (quoting *Heller*, 554 U.S. at 582.

Instead, the second step requires us to consider why and how the regulation burdens the individual's Second Amendment rights and ascertain whether the regulation is " 'relevantly similar' to law that our tradition is understood to permit." *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29). A strong indicator that the regulation "fall[s] within a permissible category of regulations" is when the regulation seeks to restrict firearm use in a similar manner and for similar reasons as a law or regulation that existed at our Nation's founding. *Id.* at 692. However, even if the regulation is created for permissible reasons, it may still violate the Second Amendment if it restricts firearms "beyond what was done at the founding." *Id.* at 692. In practice, this has typically involved comparing the challenged

38

regulation to laws that existed during the colonial and founding periods, like "going armed" and surety laws.[11] *See, e.g.*, *id.* at 681 (upholding federal law that disarms individuals subject to domestic violence restraining orders based on its analogue to "going armed" and surety laws); *Bruen*, 597 U.S. at 55-60 (analogizing to surety statutes to determine if state public-carry licensing regime was consistent with our historical tradition).

B.   WHETHER THE PLAIN TEXT OF THE SECOND AMENDMENT PROTECTS VASSALLO'S CONDUCT

Vassallo argues that, even though he has been convicted of a misdemeanor DV assault, his ability to possess a firearm is among the conduct protected by the Second Amendment. Vassallo explains that although *Bruen* and other Supreme Court cases may have suggested that Second Amendment rights belong to only "law-abiding citizens," this interpretation "directly conflicts" with other language from the Supreme Court where it has said that Second Amendment rights apply to " 'all members of the political community, not an unspecified subset.' " Appellant's Reply Br. at 31 (quoting *Heller*, 554 U.S. at 580). Vassallo also cites to Division One's recent decision in *Hamilton* where the court "presume[d] that felons are part of 'the people' protected by the Second Amendment."

---

[11] "Going armed" laws and surety laws are two legal regimes derived from English common law that governed firearms violence in the 1700s and 1800s. *Rahimi*, 602 U.S. at 681. Going armed laws prohibited individuals from "going armed" with weapons to "terrify" or "menace" others. *Id.* Individuals who broke these laws would be punished by either disarmament or imprisonment. *Id.* at 682. Surety laws required individuals who were accused of intending to harm others or "breaching the peace" to post bond before they were allowed to carry weapons in public. *Bruen*, 597 U.S. at 55. Surety laws were seen as a form of "preventative justice" that were used "to prevent all forms of violence, including spousal abuse, and also targeted the misuse of firearms." *Rahimi*, 597 U.S. at 681.

Appellant's Reply Br. at 31 (quoting 33 Wn. App. 2d at 870). Vassallo contends that *Hamilton* should be extended and that "the people" should likewise include individuals with misdemeanor convictions.

We note that there is a split between the divisions about whether "the people" in the plain text of the Second Amendment includes convicted criminals. While Vassallo is correct that one panel from Division I has presumed that felons are among "the people" protected by the Second Amendment, other panels from Division II have taken the opposite stance. *See, e.g.*, *State v. Koch*, 34 Wn. App. 2d 232, 243-44, 567 P.3d 653 (2025) (holding that the Second Amendment does not protect nonviolent felons); *State v. Bonaparte*, 32 Wn. App. 2d 266, 276, 554 P.3d 1245 (2024), *review denied*, 4 Wn.3d 1019 (2025) (rejecting claim that statute that prohibits felons from possessing firearms at step one of Second Amendment analysis).

Rather than resolve this conflict, we assume without deciding that individuals with misdemeanor DV convictions are within its protections and proceed to step two for Vassallo's challenge. *See Bruen*, 597 U.S. at 18 (explaining that if the results after step one are "inconclusive" we must move on to step two).

C. WHETHER RCW 9.41.040 IS CONSISTENT WITH OUR HISTORICAL TRADITION

Moving to step two, Vassallo argues that the State cannot show that his "lifetime disarmament" for a misdemeanor DV assault under RCW 9.41.040 is consistent with our historical tradition. According to Vassallo, RCW 9.41.040 "creates a blanket disarmament" for anyone convicted of domestic violence fourth degree assault, whereas the laws of our historical tradition ("going armed" laws and surety laws) are more tailored

to actual misuse of weapons or a more individualized assessment of risk of the individual. Appellant's Reply Br. at 34. We disagree that a prohibition on firearm possession for DV misdemeanants is inconsistent with our historic tradition.

In fact, federal courts have answered this question. Federal circuits have addressed whether 18 U.S.C. § 922(g)(9)—which prohibits individuals with misdemeanor domestic violence convictions from transporting, receiving, or possessing a firearm or ammunition—is consistent with our historical tradition, and have concluded that it is compliant with the Second Amendment, even when the underlying misdemeanor has not involved a firearm. *See, e.g.*, *United States v. Jackson*, 138 F.4th 1244, 1253-55 (10th Cir. 2025) (explaining that federal law that disarms domestic violence misdemeanants "as applied" to the defendant who had two separate domestic violence misdemeanor convictions that did not involve a firearm was consistent with the regulatory tradition of mitigating threats of physical violence); *United States v. Simmons*, 150 F.4th 126, 134 (2d Cir. 2025) (holding that it did not violate the Second Amendment to prohibit firearm access to the defendant who had previous domestic violence misdemeanor assault conviction that did not involve a firearm because Congress "has assessed domestic violence misdemeanants, as a class, to be dangerous"); *United States v. Bernard*, 136 F.4th 762, 765-66 (8th Cir. 2025), *cert. denied*, 146 S. Ct. 254 (U.S. Oct. 6, 2025) (without specifying the facts of the underlying conviction, explaining that federal law precludes domestic violence misdemeanants from possessing firearms if the "offenses involved an actual or attempted use [of] physical force, or a threatened use of a deadly weapon").

For example, in *United States v. Simmons*, the Second Circuit recently considered as a matter of first impression whether 18 U.S.C. § 922(g)(9) violates the Second Amendment's historical tradition test. 150 F.4th at 132-34. The *Simmons* court explained that an examination of the laws of seventeenth century England, the American Colonies, and the early United States, reveals that " 'it has long been permissible to regulate firearms possession . . . on a class-wide basis, without a particularized finding that the individuals disarmed pose a threat to society.' " *Id.* at 133 (quoting *Rahimi*, 140 F4th at 78-79). In other words, our Nation has a "tradition" of disarming *categories* of persons presumed to be dangerous. *Id.*[12]

From this conclusion that class-based disarmament is permissible under the Second Amendment's historical tradition test, *Simmons* had no trouble concluding that DV misdemeanants, as a class, fell within those who are presumed to be dangerous. It explained,

> Section 922(g)(9) . . . prohibits a class of people from possessing firearms because "Congress perceives them, broadly, as dangerous." This perception is well-founded. "[D]omestic abusers with firearms are dangerous not only to their direct victims, but also to accompanying loved ones, bystanders, and responding law enforcement officers." In addition, "[d]omestic violence often escalates in severity over time, and the presence of a firearm

---

[12] *See also United States v. Gailes*, 118 F.4th 822, 827 (6th Cir. 2024) ("*Rahimi* held that people subject to domestic-violence restraining orders may be categorically disarmed without violating the Second Amendment."); *Jackson*, 138 F.4th at 1255 (rejecting argument that defendant's specific misdemeanor domestic violence convictions "should be treated differently" by reasoning that he is still categorically a convicted domestic violence misdemeanant, "[r]egardless of the supposed remoteness of the offense or the absence of a firearm in the underlying conduct"); *United States v. Duarte*, 137 F.4th 743, 759 (9th Cir. 2025) ("The historical record reveals a host of regulations that disarmed those whom the legislature deemed dangerous on a categorical basis."), *cert. denied*, 25-425 2026 WL 135692 (U.S. 2026).

increases the likelihood that it will escalate to homicide." It is therefore "no surprise . . . that Congress sought to deprive people with domestic-violence convictions from possessing firearms," and *Zherka* confirms that Congress may do so without a particularized judicial determination as to the future dangerousness of the particular domestic violence misdemeanant to be disarmed.

*Simmons*, 150 F.4th at 133-34 (some alterations in original) (internal citations omitted) (quoting *Zherka v. Bondi*, 140 F.4th 68, 90 (2d Cir. 2025); *Gailes*, 118 F.4th at 827; *United States v. Castleman*, 572 U.S. 157, 160, 134 S. Ct. 1405, 188 L. Ed. 2d 426 (2014)).

We find *Simmons* persuasive in the application of the Second Amendment to RCW 9.41.040. The concern expressed by Congress about the dangerousness, as a class, of DV misdemeanants has been mirrored by our legislature in the enactment of RCW 9.41.040. Indeed, in 2023, our legislature recognized that gun violence from an abuser poses a great risk for victims of domestic violence. LAWS of 2023, ch. 295 § 1(4). This is true even if an abuser has been convicted of only a misdemeanor.

> An extensive body of research has identified specific risk factors that increase the likelihood of individuals engaging in future violence, including gun violence, and presenting further risk to public safety. The strongest predictor of future violence is prior violent behavior, including perpetration of domestic violence and violent misdemeanors. . . . Research provides important guidance regarding events that should result in temporary prohibition of firearm rights so that the laws regarding firearm possession and the restoration of firearm rights are grounded in risk assessment data to help protect public health and safety while upholding individual liberty. These changes are not intended to punish, but to provide a regulatory framework to help ensure the safety of those with a heightened risk of experiencing gun violence.

*Id.*

Our legislature's clear linkage of the risk of violence from having firearms in the hands of DV misdemeanants, as a class, and its decision to bar those individuals from

possessing firearms is consistent with our Nations's tradition of restricting firearms access to categories of people who are presumed to be dangerous. *Simmons*, 150 F.4th at 133. For these reasons, we conclude that RCW 9.41.040 is constitutional as applied to Vassallo.[13] We affirm his restriction on his firearms access.

## CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

CHE, J.

---

[13] Vassallo contends at times that his as-applied challenge is, at least in part, based on the fact that his *particular* crime did not involve firearms. Yet, Vassallo's constitutionality argument is framed entirely on whether RCW 9.41.040, and its categorical firearm restriction on DV misdemeanants, survives Second Amendment scrutiny under the historical tradition test. Vassallo offers nothing to suggest that his as-applied challenge is legally viable if his historical tradition argument fails. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."). Thus, having concluded that RCW 9.41.040 satisfies the Second Amendment, we end our analysis.